IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FILED

SEP - 6 2019

KATE BARKMAN, Clerk
By_____ Dep. Clerk

| | | |
|---|---|---|
| STEVEN HUTCHINSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| LOUIS S. FOLINO, ET AL. | : | NO. 13-3931 |

## MEMORANDUM

**Padova, J.**                                                              **September 6, 2019**

Before the Court is Steven Hutchinson's Petition for Writ of Habeas Corpus pursuant to

28 U.S.C. § 2254. On July 23, 2018, United States Magistrate Judge Richard A. Lloret filed a

Report and Recommendation recommending that we deny the Petition in its entirety. Hutchinson

has filed Objections to the Report and Recommendation. For the reasons that follow, we overrule

the Objections, adopt the Report and Recommendations, and deny the Petition with prejudice.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

On December 9, 1999, Hutchinson was convicted by a jury of first-degree murder and other

offenses in connection with the shooting of Stephanie Epps on September 16, 1997. (12/9/99 N.T.

at 5-6.) Stephanie Epps, who had dated Hutchinson for nearly a year prior to her death, was shot

and killed in the lobby of her apartment building, in front of her children, Desiree Epps, then seven

years old, and Philip Epps, then nine years old. Commonwealth v. Hutchinson, 811 A.2d 556, 558

(Pa. 2002) ("Hutchinson I"). When the police arrived at the scene, both children identified

Hutchinson as the shooter. (Id.) Philip Epps testified at trial that, on the day of the shooting,

Hutchinson met Philip, Desiree, and their mother at the children's church after school program.

(12/2/99 N.T. at 55-56.) Hutchinson and Epps began arguing when they all left the church. (Id.

at 57, 84-85.) Philip, Desiree, and their mother left the church in Epps's car, and Hutchinson

followed them in his black Lexus. (Id. at 57-58.) Back at their apartment building, Philip saw his

mother and Hutchinson start arguing again. (Id. at 58.) Hutchinson followed Epps and the children into the apartment building and shot at Epps four or five times as they were waiting for the elevator. (Id. at 59-60.) "According to the medical examiner, two of [the] bullets struck Epps, one in the head and one in the abdomen." Hutchinson I, 811 A.2d at 559.

Another resident of the apartment building, Eugene Green, testified at Hutchinson's trial that he had just gotten off of a bus across the street from the apartment building when he saw a black Lexus leaving the building's parking lot. (12/3/99 N.T. at 47-48.) Green identified Hutchinson in court and testified that he had seen him driving a black Lexus in the past. (Id. at 51.) Green further testified that, after he saw the black Lexus leave the parking lot, he saw the Epps children running toward him, and Desiree asked him to call the police because their mother had been shot. (Id. at 48-49.) Green helped the children call the police from a 7-11. (Id. at 49.) "One of the responding officers, who brought the children's father to the scene of the crime, testified that when the children saw their father, they ran up to him, and Desiree told him that 'Mr. Steve' shot her mother." Hutchinson I, 811 A.2d at 559.

Epps's sister, Jennifer Pugh, testified at Hutchinson's trial that Epps visited her on September 12, 1997, four days before her death. (12/3/99 N.T. at 66-68.) Id. Pugh told the jury that Epps told her that Hutchinson had slapped her so hard "she flew across the room." (Id. at 68.) Pugh further testified that on the night of September 12, 1997, she and Epps went to their parents' home and, while they were there, Hutchinson attempted to enter the home looking for Epps. (Id. at 71-72.) Pugh also testified that Epps spent that night in a hotel and, the next day, went to obtain a protection from abuse order, but did not complete the application. (Id. at 74.) Captain John Keaveney of the Philadelphia Sheriff's Office testified that on September 13, 1997, Epps went to the Philadelphia Criminal Justice Center and signed her name in the logbook for protection from

2

abuse requests. (Id. a 141-44.) She wrote in the book that she was seeking protection from a man named Steve Marshall. (Id. at 141-44.) Epps had the locks on her apartment changed on September 13, 1997. Hutchinson I, 811 A.2d at 559.

Shannon Husbands testified at trial that she also had a relationship with Hutchinson and that Hutchinson used the name "Steven Marshall." (12/6/99 N.T. at 133-35.) Husbands also identified Hutchinson in the courtroom. (Id. at 135.) Octavia Tucker, who had a relationship with Hutchinson between May 1996 and July 1997, testified at trial that Hutchinson used the name Steven Marshall when they were dating. (Id. at 169-70, 176-77.)

Hutchinson's trial counsel presented an alibi defense at trial. Hutchinson I, 811 A.2d at 560. He "presented a witness who testified that [Hutchinson] was at a restaurant in Brooklyn, New York, on the day of the shooting and that he had been in and around New York during the entire week prior to the incident." Id. Hutchinson's trial counsel also "attempted to undermine the credibility of the children's testimony, and advanced the theory that the victim's estranged husband was responsible for the murder." Commonwealth v. Hutchinson, 25 A.3d 277, 283-84 (Pa. 2011) ("Hutchinson II"). The jury found Hutchinson guilty of first-degree murder, carrying firearms on public streets, possessing instruments of crime, and two counts of recklessly endangering another person. (12/9/99 N.T. at 5-6.) Following the penalty phase hearing, the jury "returned a verdict of death for the murder conviction." Hutchinson I, 811 A.2d at 560. The Pennsylvania Supreme Court denied Hutchinson's appeal and affirmed his sentence of death. Id. at 562.

Hutchinson subsequently filed a petition for relief under Pennsylvania's Post Conviction Relief Act, 42 Pa. Cons. Stat. Ann. §§ 9541-46 ("PCRA"). In his PCRA petition, Hutchinson asserted claims regarding both the guilt and penalty phases of his trial, including claims of

3

ineffective assistance of trial and direct appeal counsel.[1] Hutchinson II, 25 A.3d at 284-85. Hutchinson's guilt phase claims asserted that his trial and/or appellate counsel were ineffective for (1) failing to object at trial and argue on appeal that the prosecutor, Assistant District Attorney ("ADA") William Fisher, used his peremptory strikes in jury selection in a discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79 (1986); (2) failing to object at trial and raise a claim on appeal regarding the jury being present while the Epps children were colloquied regarding their competency to testify; (3) failing to object at trial to the admission of evidence regarding prior bad acts; (4) failing to object at trial and raise a claim on appeal regarding instances of prosecutorial misconduct; (5) failure to investigate or present alternative defenses for use at trial; and (6) failure to object at trial and raise a claim on appeal regarding a time limitation the trial court set on closing argument. Hutchinson II, 25 A.3d at 286, 287, 289, 299, 306, 311-12, 315. The PCRA Court denied Hutchinson's guilt phase claims without an evidentiary hearing, but granted his penalty phase claims. See id. at 284, 320. Hutchinson was resentenced to life imprisonment without the possibility of parole on January 23, 2013. Hutchinson appealed the PCRA Court's denial of his guilt phase claims. Id. at 318-21. The Pennsylvania Supreme Court denied Hutchinson's appeal in its entirety. Id. at 322.

Hutchinson filed the instant Petition on July 3, 2013. The Petition raises eight claims for relief: (1) the Commonwealth used its peremptory strikes in a racially discriminatory manner in violation of Batson and Hutchinson's trial and appellate counsel were ineffective for failing to raise this claim; (2) the Commonwealth improperly introduced evidence of other bad acts, the trial court failed to give the appropriate cautionary instruction to the jury, and Hutchinson's trial and

---

[1] Hutchinson was represented by different counsel at trial and on direct appeal. Hutchinson II, 25 A.3d at 286.

appellate counsel were ineffective for failing to raise these claims; (3) the prosecutor engaged in acts of misconduct and Hutchinson's trial and appellate counsel were ineffective for failing to raise these claims; (4) the Epps children were improperly colloquied with respect to their competency to tell the truth in front of the jury and Hutchinson's trial and appellate counsel were ineffective for failing to raise this claim; (5) the trial court improperly limited trial counsel's closing argument and trial and appellate counsel were ineffective for failing to raise this claim; (6) trial counsel was ineffective in failing to investigate certain alternative defenses and appellate counsel was ineffective in that he failed to raise this claim on direct appeal; (7) Hutchinson's trial was conducted by a biased judge who improperly denied Hutchinson's motion for recusal from his PCRA proceedings; and (8) as a result of the cumulative effect of these errors, Hutchinson was denied due process and the effective assistance of his attorneys. In a thorough and well-reasoned Report and Recommendation, Magistrate Judge Richard A. Lloret recommends that we deny Hutchinson's Petition in its entirety. Hutchinson has filed Objections to Magistrate Judge Lloret's recommendations with respect to just four of his claims for relief.

## II.    STANDARD OF REVIEW

Where a habeas petition has been referred to a magistrate judge for a report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. [The Court] may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The state habeas statute, 28 U.S.C. § 2254, provides that the "district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The

petitioner carries the burden of proof." Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citation omitted).

Pursuant to § 2254, a petition for writ of habeas corpus may be granted only if (1) the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court explained the two components of § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id. at 412-13. In order to determine whether a state court's application of federal law is "'unreasonable,'" a court must apply an objective standard, such that the relevant application "may be incorrect but still not unreasonable." Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001) (quoting Williams v. Taylor, 529 U.S. at 409-10). The test is whether the state court decision "resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir. 1999) (*en banc*). With respect to § 2254(d)(2), "'[f]actual issues determined by a state court are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence.'" Dellavecchia v. Sec'y Pa. Dep't of Corrs., 819 F.3d 682, 692 (3d Cir. 2016) (alteration in original) (quoting Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000)).

## III. DISCUSSION

Hutchinson objects to four of the Magistrate Judge's Recommendations:

(1) the Magistrate Judge's recommendation that we deny his ineffective assistance of counsel claim regarding the prosecutor's use of peremptory challenges in jury selection;

(2) the Magistrate Judge's recommendation that we deny his ineffective assistance of counsel claim concerning the questioning of the Epps children in front of the jury regarding their competency to tell the truth;

(3) the Magistrate Judge's recommendation that we deny his ineffective assistance of counsel claim regarding allegedly improper vouching for the ability of the Epps children to testify truthfully by the prosecutor and a witness; and

(4) the Magistrate Judge's recommendation that we deny his ineffective assistance of counsel claim regarding his trial counsel's failure to investigate certain alternative defenses.

### A. Ineffective Assistance of Counsel

A claim for ineffective assistance of counsel is grounded in the Sixth Amendment right to counsel, which exists "'in order to protect the fundamental right to a fair trial.'" Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)) (additional citations omitted). In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must demonstrate both that (1) his attorney's performance was deficient, i.e., that the performance was unreasonable under prevailing professional standards, and (2) that he was prejudiced by his attorney's performance. Strickland, 466 U.S. at 687-88, 691-92. An attorney's performance is deficient if it falls "below an objective standard of reasonableness." Id. at 688. Prejudice is proven if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A

7

reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "We may address the prejudice prong first '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice.'" United States v. Travillion, 759 F.3d 281, 289 (3d Cir. 2014) (alteration in original) (quoting Strickland, 466 U.S. at 697). Counsel cannot be found to be ineffective for failing to pursue a meritless claim. See United States v. Bui, 795 F.3d 363, 366-67 (3d Cir. 2015) ("'[T]here can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument.'" (quoting United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999))).

## B. Batson

Hutchinson argues that the Pennsylvania Supreme Court's denial of his layered ineffective assistance of counsel claim regarding trial and appellate counsel's failure to object to and argue on appeal that the prosecutor used his peremptory strikes in a racially discriminatory manner in violation of Batson was contrary to or an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts.[2] The Pennsylvania Supreme Court denied this ineffective assistance of counsel claim based on its conclusion that a Batson challenge would have been meritless and, thus, counsel cold not be deemed ineffective in failing to raise it. See Hutchinson, 25 A.3d at 289. Hutchinson argues in his habeas petition that the

---

[2] Hutchinson's ineffective assistance of counsel claims are layered because he did not bring claims of ineffective assistance of trial counsel in his direct appeal, which he filed prior to Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002). Grant held that "as a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review." Id. at 738. Prior to Grant, Pennsylvania law required defendants "'to raise all claims alleging ineffective assistance at the first stage at which they were represented by new counsel.'" Showers v. Beard, 635 F.3d 625, 629 n.5 (3d Cir. 2011) (quoting Commonwealth v. Fletcher, 986 A.2d 759, 773 n.16 (Pa. 2009)). Consequently, where a petitioner brought a direct appeal prior to Grant, "[t]o preserve a claim of ineffectiveness, the petitioner must plead in his PCRA petition that such appellate counsel was ineffective for failing to raise all prior counsel's ineffectiveness." Commonwealth v. Duffy, 855 A.2d 764, 768 (Pa. 2004) (citation omitted).

8

Pennsylvania Supreme Court's decision was based on an unreasonable application of <u>Batson</u> because the Court failed to follow the three-step formula set out in <u>Batson</u> and, instead, followed its own precedent, which relieved it of any obligation to follow that three-step process.

The Magistrate Judge recommends that the Pennsylvania Supreme Court's reliance on its own precedent resulted in an unreasonable application of <u>Batson</u> (R&R at 18), but also recommends that Hutchinson's <u>Batson</u> claim lacks merit under *de novo* review. Specifically, the Magistrate Judge recommends that Hutchinson has not established a prima facie case at the first step of the <u>Batson</u> inquiry. (<u>Id.</u> at 23.) Hutchinson objects only to the Magistrate Judge's recommendation that he has not set forth a meritorious <u>Batson</u> claim of racially discriminatory jury selection.

### 1.    The Batson analysis

The <u>Batson</u> analysis consists of three steps: "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" <u>Johnson v. California</u>, 545 U.S. 162, 168 (2005) (quoting <u>Batson</u>, 476 U.S. at 93-94). "Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes." <u>Id.</u> (quoting <u>Batson</u>, 476 U.S. at 94; and citing <u>Alexander v. Louisiana</u>, 405 U.S. 625, 632 (1972)). "Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'" <u>Id.</u> (alterations in original) (quoting <u>Purkett v. Elem</u>, 514 U.S. 765, 767 (1995) (per curiam)). "[A] defendant satisfies the requirements of <u>Batson's</u> first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." <u>Id.</u> at 167. The Supreme Court has defined "inference" in this context as "a 'conclusion reached

by considering other facts and deducing a logical consequence from them.'" Id. at 168 n.4 (quoting Black's Law Dictionary 781 (7th ed. 1999)).

"[A] prima facie case of discrimination can be made out by offering a wide variety of evidence." Id. at 169 (citing Batson, 476 U.S. at 94). The United States Court of Appeals for the Third Circuit has explained that the first step of the Batson analysis "is not intended to be particularly onerous, and 'the defendant is entitled to rely on the fact . . . that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate.'" Williams v. Beard, 637 F.3d 195, 214 (3d Cir. 2011) (alteration in original) (quoting Abu-Jamal v. Horn, 520 F.3d 272, 288 (3d Cir. 2008)). The Supreme Court has identified two particular types of evidence that are relevant to step one of the Batson analysis: "[f]irst, the defendant may proffer evidence that the government exercised a '"pattern" of strikes against black jurors included in the particular venire, [which] might [then] give rise to an inference of discrimination.'" Id. (second and third alterations in original) (quoting Batson, 476 U.S. at 97). "Second, 'the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose.'" Id. (quoting Batson, 476 U.S. at 97).

### 2. Hutchinson's evidence

Hutchinson relies primarily on statistical evidence to satisfy his burden at the first step of the Batson analysis. "Statistical evidence may be sufficient by itself to make out a prima facie case of racial discrimination." Id. (citations omitted). For example, the Third Circuit has found that the petitioner had established a prima facie case pursuant to Batson "when the prosecutor used eleven of twelve strikes to remove African American venirepersons[,]" and "where the Commonwealth used thirteen of its fourteen strikes to remove African Americans." Id. (citing

10

first Holloway v. Horn, 355 F.3d 707, 722 (3d Cir. 2004); and then Brinson v. Vaughn, 398 F.3d 225, 234-35 (3d Cir. 2005))). The Third Circuit has also "strongly implie[d] that a prosecutor who removes twelve of fourteen African American venire members exhibits a pattern of strikes sufficient to raise an improper inference." Id. (citing Hardcastle v. Horn, 368 F.3d 246, 256 (3d Cir. 2004)). In fact, the prosecutor's strikes in Holloway, Brinson, and Hardcastle were so compelling that the evidence of the strikes was "sufficient to satisfy the prima facie threshold even without evidence of the venire's racial makeup." Id. at 215.

Hutchinson maintains that the evidence of the prosecution's strikes in this case is similarly compelling. He contends that the Commonwealth had the opportunity to strike 45 members of the venire. He asserts that he has been able to ascertain the race of 43 of these individuals and he states that sixteen were African-American and twenty-seven were not. (Pet. Mem. Exs. 3-5; Pet. Reply at 7-8.) Hutchinson states that the prosecutor struck 10 of the 16 African American members of the venire, or 62.5%, and only 8 of the non-African-American members of the venire, or 29.6%. (See Pet. Mem. at 16 n.4, Exs. 3-5; Pet. Reply at 8.) One of the twelve seated jurors was African-American, as was one of the alternates. (Id. at 16 n.4, Exs. 3-5; Pet. Reply at 8.) Hutchinson further states that ten of the seated jurors were Caucasian and the race of the remaining juror is unknown, as is the race of one of the two alternates. (Id. at 16, Exs. 3-5; Pet. Reply at 8.) The evidence of record, however, does not support Hutchinson's assertions regarding the race of 19 members of the venire, two of whom were seated as jurors.[3]

---

[3] In footnote 4 of his Memorandum of Law, Hutchinson asserts that the following members of the venire are of the race indicated in parenthesis: Jefferson (African-American), Seaman (Causasian), Gilmore (African-American), Conicelli (Caucasian), Punett (Caucasian), Watson (African-American), Cappella (Caucasian), O'Toole (Caucasian), Umbach (Caucasian), Crooks (African-American), Smith (African-American), O'Neill (Caucasian), Torres (Hispanic), Wilt, (Caucasian) Homewood (Caucasian), Abson (African-American), and Ybarra (Hispanic). (See Pet. Mem. at 16 n.4.) Hutchinson relies on Exhibit 5 as evidence of the race of these members of

11

The findings of the PCRA Court regarding the race of the venire members, on which the Pennsylvania Supreme Court relied, do not align with Hutchinson's assertions here. As the Pennsylvania Supreme Court observed:

> the PCRA court pointed out that 53 persons were eligible to be struck by either the Commonwealth or the defense; of this total, 20 were African-American and 33 were non-African-American. The Commonwealth used 18 of its available 20 peremptory strikes, 10 against African–Americans and 8 against non-African-Americans. The defense used 21 strikes, 8 against African-Americans and 13 against non-African-Americans. Of the 8 African-Americans struck by the defense, the Commonwealth had accepted 4 of them before they were struck by the defense.

Hutchinson II, 25 A.3d at 287-88 (citing 10/25/06 PCRA Court Opinion at 3). While Hutchinson would prefer that we rely on his assertions as to the size and racial composition of the venire, we must presume "'[f]actual issues determined by a state court . . . to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence.'" Dellavecchia, 819 F.3d at 692 (alteration in original) (quoting Werts, 228 F.3d at 196). Since Hutchinson's assertions regarding the race of 19 members of the venire are not supported by any evidence of record, we conclude that he has not rebutted the presumption that the state court's findings regarding the size and racial composition of the venire are correct with clear and convincing

---

the venire. (See id.) \Exhibit 5, which consists of voter registration print outs, contains information with respect to the race of some of the members of the venire. However, Exhibit 5 does not support Hutchinson's assertions with respect to the race of the listed individuals for two reasons. Exhibit 5 does not include voter registration print outs for Jefferson, Seaman, Gilmore, Conicelli, Punett, Watson, Cappella, O'Toole, Umbach, Smith, O'Neill, Torres, Wilt, and Homewood; and the voter registration print outs for Crooks, Abson, and Ybarra do not include information with respect to the race of those individuals. We note that the Commonwealth agrees that Torres is Hispanic and that Abson is African American. (See Commonwealth Resp. at 14.) However, the Commonwealth has also supplied no evidence regarding the race of these members of the venire. The record also lacks any evidence as to the race of two seated jurors whom Hutchinson claims were Caucasian (Cardone and Anderson) as the voter registration print out for Anderson does not note her race and Exhibit 5 does not contain a voter registration print out for Cardone. (See Pet. Mem. at 16, n.4; Ex.5.)

evidence and we accept for purposes of our analysis that the size and racial composition of the venire were correctly found by the state court.

Hutchinson argues that the prosecutor's strike rate and acceptance rate support a prima facie case under Batson. "The strike rate is computed by comparing the number of peremptory strikes the prosecutor used to remove black potential jurors with the prosecutor's total number of peremptory strikes exercised." Abu-Jamal v. Horn, 520 F.3d 272, 290 (3d Cir. 2008), vacated on other grounds sub nom. Beard v. Abu-Jamal, 558 U.S. 1143 (2010). The prosecutor's strike rate was 55.5% (10 of 18 strikes were used against African-Americans). See id. The strike rate in this case is insufficient, in and of itself, to establish a prima face case under Batson. See Abu-Jamal, 520 F.3d at 293 (noting that "the prosecution used ten of fifteen peremptory strikes against black potential jurors. We have never found a prima facie case based on similar facts"); Lewis v. Horn, 581 F.3d 92, 104 (3d Cir. 2009) (denying Batson claim where "even if we were to accept as true Lewis's bald assertion that eight of the twelve venire members whom the prosecutor struck were African American, a strike rate of 66.67% is insufficient information to establish a prima facie case of racial discrimination in the exercise of peremptory strikes" (citing Abu-Jamal, 520 F.3d at 293)).

"Evidence contrasting the rate at which the prosecution accepts black and white jurors may also raise an inference of discrimination." Williams v. Beard, 637 F.3d at 215; see also Bond v. Beard, 539 F.3d 256, 269-70 (3d Cir. 2008) (calculating the prosecutor's acceptance rate by comparing the number of African American venire persons accepted by the prosecutor with the number of African American venire persons he had the opportunity to strike). In this case, the prosecutor accepted 37.5% of the African-American members of the venire whom he had the

opportunity to strike (six of sixteen).[4] See Hutchinson II, 25 A.3d at 287-88. The Third Circuit has found that an acceptance rate of 41 to 47% of African-American members of a venire compared to an acceptance rate of 83% of Caucasian members of the same venire can raise an inference of discrimination under Batson. See Williams v. Beard, 637 F.3d at 215 (citing Bond v. Beard, 539 F.3d 256, 270 (3d Cir. 2008)). Hutchinson claims that the prosecutor accepted 70.4% of Caucasian members of the venire in his case. (See Obj. at 9.) However, the record does not contain evidence of the races of all of the members of the venire accepted by the prosecutor. (See Pet. Mem. at 16 n.4, Ex. 5.[5]) Consequently, we cannot calculate the prosecutor's acceptance rate for Caucasian member of the venire in this case and we cannot conclude that the disparity in the prosecutor's acceptance rates for Caucasian and African-American members of the venire is sufficient to support an inference of discrimination.

Hutchinson does not rely entirely on the prosecutor's strike and acceptance rates at his trial to support his Batson claim. He also argues that we can infer discrimination based on the Commonwealth's strike rate in other capital cases, ADA Fisher's personal strike rate in other capital cases, and evidence of the training given to attorneys with the Philadelphia District Attorney's ("DA's") Office. Hutchinson contends that the Commonwealth struck African-Americans venire members 49% of the time and non-African-American venire members only 25% of the time in other capital cases during the tenure of the Philadelphia District Attorney who was in office at the time of his trial. However, Hutchinson has not submitted any evidence that supports

---

[4] According to the PCRA Court, the defense struck four of the twenty African American members of the venire before the prosecutor had the chance to accept or reject them. See Hutchinson II, 25 A.3d at 288.

[5] The record does not contain any evidence with respect to the race of two members of the venire who were accepted by the prosecution and struck by the defense who Hutchinson claims were Caucasian: Homewood and Wilt. (Pet. Mem. at 16 n.4, Ex. 5.)

14

this contention, and his bald allegations cannot be used to raise an inference of discrimination at the first step of the Batson analysis. Hutchinson also asserts that ADA Fisher struck African-Americans from juries in other capital cases at a higher rate (48%) than he struck non-African-Americans (28%). In support of this assertion, he has provided the names and dates of those trials, but he has not submitted any evidence regarding jury selection in those cases. In the an absence of such supporting evidence, we also cannot consider the asserted rates at which ADA Fischer struck jurors in other capital cases.

Hutchinson also argues that a training tape created by former ADA Jack McMahon (the "McMahon tape") and a training lecture by ADA Bruce Sagel (the "Sagel lecture") are evidence of a culture of racial discrimination in jury selection within the Philadelphia DA's Office that supports an inference of discrimination in this case. In the McMahon tape, which was created in 1987, see Howard v. Horn, 56 F. Supp. 3d 709, 723-24 (E.D. Pa. 2014) (citation omitted), "McMahon repeatedly advises his audience to use peremptory strikes to keep certain categories of African-Americans from serving on criminal juries, in apparent violation of Batson." Wilson v. Beard, 426 F.3d 653, 655 (3d Cir. 2005). The Sagel lecture was given at the DA's Office in August 1990, and, like the McMahon tape, included instruction "to use race as a factor in selecting juries." Bond, 539 F.3d at 273. While the McMahon tape and Sagel lecture suggest that certain prosecutors were trained to improperly use race in jury selection, Hutchinson does not suggest that ADA Fisher ever viewed the McMahon tape or attended Sagel's lecture. Furthermore, both the McMahon tape and the Segal lecture took place many years prior to Hutchinson's 1999 trial. Consequently, the tape and the lecture "fail[] to provide any information about the routine practices of the particular prosecutor in [Hutchinson]'s case or the practices actually utilized at [Hutchinson]'s trial," and "will not do as a substitute for the concrete, case specific information that is necessary to

15

demonstrate a prima facie Batson violation." Lewis v. Horn, 581 F.3d 92, 104 (3d Cir. 2009). Indeed, as the Third Circuit has explained, the McMahon tape is "of little significance where the petitioner [is] unable to show that the district attorney responsible for his prosecution had seen the tape or followed its recommendations." Williams v. Beard, 637 F.3d at 219 n.19 (citing Lewis, 581 F.3d at 104).

Since Hutchinson has not shown that there is any link between ADA Fisher and either the McMahon tape or the Sagel lecture, we conclude that the existence of the tape and the lecture, even when considered with Hutchinson's statistical evidence, does not support an inference of discrimination at the first step of Batson. See Howard, 56 F. Supp. 3d at 724 (rejecting argument that the McMahon video and the Segal lecture supported a prima facie case of discriminatory jury selection in violation of Batson where there was no evidence supporting a "direct link between prosecution in this case and the training video" and no evidence "suggesting that the prosecutor in [the] case was aware of or had attended the alleged lecture"). We further conclude, accordingly, that Hutchinson has failed to establish a prima facie case of discriminatory jury selection in violation of Batson. Since counsel cannot be found to be ineffective for failing to pursue a meritless claim, Bui, 795 F.3d at 366-67 (quotation omitted), we overrule Hutchinson's objection to the Magistrate Judge's recommendation that we deny his layered ineffective assistance of counsel claim regarding the prosecutor's use of peremptory challenges in jury selection. (R&R at 23.)

## C. The Questioning of the Epps Children

Hutchinson argues that his substantive due process rights were violated when the trial court allowed the Epps children to be colloquied about their competency to testify in front of the jury because the colloquy "telegraphed to the jury that the trial judge found these witnesses to be

16

credible." (Pet. Mem. at 56.)    Hutchinson claims that his trial and appellate counsel were
ineffective for failing to object to the colloquy and raise this issue on direct appeal.

The Epps children were the only eyewitnesses to their mother's murder. At the time of the
murder, Desiree was seven-years-old and Philip was nine-years-old. Hutchinson I, 811 A.2d at
558. Desiree was nine when she testified at Hutchinson's trial and Philip was twelve. Hutchinson
II, 25 A.3d at 289. Under Pennsylvania law, the "competency of a witness is generally presumed,"
but "witnesses under the age of fourteen [are] subject to judicial inquiry into their testimonial
capacity." Id. at 289-90 (quotations omitted).  The inquiry focuses on "the mental capacity of that
witness to perceive the nature of the events about which he or she is called to testify, to understand
questions about that subject matter, to communicate about the subject at issue, to recall
information, to distinguish fact from fantasy, and to tell the truth." Id. at 290 (quotation omitted).
"In Pennsylvania, competency is a threshold legal issue, to be decided by the trial court." Id.
(citation omitted).  Moreover, due to "concern that a trial judge's ruling of competence would be
interpreted by the jury as a judicial endorsement of the witness's credibility[,]" the Pennsylvania
Supreme Court has "set forth a *per se* rule requiring that the jury not be present during a
competency hearing for a child witness." Id. at 290 (citing Commonwealth v. Washington, 722
A.2d 643, 646, 647 (Pa. 1998)).

While the trial court did not hold a formal competency hearing with respect to the Epps
children, "the children were questioned as to their understanding of the concept of truth versus a
lie immediately prior to their testimony concerning the murder of their mother. The jury heard all
of the questions directed to the children and their answers." Hutchinson II, 25 A.3d at 294-95.
The Court Clerk first asked Desiree a few questions about her ability to tell the truth and then the
prosecutor questioned her about her ability to tell the difference between the truth and a lie:

17

Court Officer: What is your name?

[Desiree]: Desiree.

Court Officer: Desiree, what is your last name?

[Desiree]: Epps

Court Officer: Do you know what the deference [sic] between telling the truth and telling a lie is?

[Desiree]: Yes.

Court Officer: If I asked you to swear on that Bible that you would tell the truth, the whole truth and so help you God, would you understand that?

[Desiree]: Yes.

Court Officer: Would you say yes if I asked you that?

[Desiree]: Yes.

Court Officer: Do you promise to tell the truth, the whole truth and nothing but the truth?

[Desiree]: Yes.

Court Officer: Thank you. The judge and these gentlemen here will talk to you. Please keep your voice up.

Court: Desiree, you will have to speak into that microphone. You will have to pretend that that red box in the back of that courtroom is where you are speaking to so everybody can hear you; all right?

Desiree: Yes.

Court: Because we need to hear what you have to say.

[Prosecutor]: Desiree, hello.

[Desiree]: Hello.

[Prosecutor]: Do you know who I am?

[Desiree]: Yes.

[Prosecutor]: Who are you [sic]?

[Desiree]: Mr. Fisher.

[Prosecutor]: Desiree, would you tell the jurors how old you are.

[Desiree]: Eight, I mean nine.

[Prosecutor]: When did you turn nine?

[Desiree]: September 14th.

[Prosecutor]: Desiree, you said that you know the difference between telling the truth and telling a lie; is that right?

[Desiree]: Yes.

[Prosecutor]: What's the difference between telling a lie and telling the truth? Can you tell us?

[Desiree]: (No response).

[Prosecutor]: Let me ask you another question: If I told you this suit was red, would that be the truth or would it be a lie?

[Desiree]: A lie.

[Prosecutor]: If I said we were in your living room right now, would that be the truth or a lie?

[Desiree]: A lie.

18

(12/1/99 N.T. at 117–19). Following this exchange, Desiree was questioned by the prosecutor

regarding the day of her mother's murder and then cross-examined by defense counsel. (Id. at

121-35; 12/2/99 N.T. at 3-50.) Philip testified after Desiree, and he was briefly questioned by the

prosecutor regarding his ability to tell the truth from a lie:

> Q: Philip, do you know the difference between telling a lie and telling the truth?
> A: Yes.
> Q: Could you tell us what the difference is, please?
> A: Okay. The truth is like the right thing to do – Well, it is like the right thing to happen, and a lie is the opposite of the truth.
> Q: That is pretty good. That is stated pretty good. The truth is telling about the thing the way it happened and a lie is telling something else—
> A: Yes.
> Q: That didn't happen, okay. Philip, do you recall the last day that you saw your mom?

(12/2/99 N.T. at 54.). Following this testimony, Philip was examined by the prosecutor regarding

the events that took place on the day his mother was killed and then cross-examined by defense

counsel. (Id. at 54-143.)

The Pennsylvania Supreme Court found that, because the Epps children were questioned

regarding their understanding of the truth versus a lie in front of the jury, "there [was] arguable

merit to [Hutchinson's] assertion that the trial court's *voir dire* procedure violated the *per se* rule

promulgated in Washington. 25 A.3d at 294-95. The Court nevertheless denied Hutchinson's

ineffective assistance of counsel claims arising from that questioning, concluding that Hutchinson

could not establish that he had been prejudiced by his counsel's failure to object to the questioning.

Id. at 295 (citation omitted). The Pennsylvania Supreme Court based its determination on the

following. First, "the trial court never issued an express or formal ruling that the children were

competent to testify. In fact, the trial court never made any mention of the children's competency"

and, thus, "the trial court did not endorse or vouch for the credibility of any part of the children's

testimony." Id. Second, "the trial court expressly and repeatedly instructed the jury that it was the

19

sole fact-finder and sole judge of credibility." Id. Third, "other evidence admitted at trial was consistent with the testimony of the children." Id. at 296. Fourth, "the children were unwavering in their testimony that [Hutchinson] shot their mother after she had entered their apartment building and was waiting for an elevator" and they "knew [Hutchinson] as their mother's boyfriend who had stayed at their residence on some occasions, and they identified him in court without hesitation." Id. at 296-97.

Hutchinson claims in his habeas petition that the Pennsylvania Supreme Court's denial of this ineffective assistance of counsel claim was contrary to and an unreasonable application of Strickland. The Magistrate Judge recommends that we deny this habeas claim because "[t]he Pennsylvania Supreme Court's interpretation of its own decision, in Washington, is not remediable on habeas review" and because Hutchinson identified no Supreme Court precedent holding that it is "*per se* unconstitutional" to question child witnesses in front of a jury about their competency to tell the truth. (R&R at 87-88.)

Hutchinson contends that the Magistrate Judge's recommendation is wrong, and that the Pennsylvania Supreme Court's determination that he was not prejudiced by his counsel's failure to object to the colloquy of the Epps children was an unreasonable application of Strickland, for three reasons. Hutchinson first asserts that, even though the trial court did not pronounce the children credible in front of the jury, the jury could only have understood the colloquy regarding their ability to distinguish truth from lies "as a preliminary 'test' to be passed and upon which the court would decide whether to allow [the] testimony of the children. That the court, upon hearing the children's responses, permitted them to testify could only have been taken one way; the children enjoyed the imprimatur of the court." (Pet. Mem. at 60.) Hutchinson's conjecture

regarding the understanding of the jury is, however, unsupported by any citations to the record or to law and we decline to adopt it.

Hutchinson next asserts that, notwithstanding the trial court's instructions that the jury is the sole judge of witness credibility, the jury may have been influenced by the "court's stamp of approval" of the child witnesses because "nothing in the court's instruction forbade the jury from using the court's rulings in favor of the children as a guidepost from which to assess their credibility." (Id. at 61.) However, the trial court did not make any rulings with respect to the children's credibility. This argument rests entirely on Hutchinson's wholly unsupported assertion that the jury understood the children's colloquy as a court-administered test that they had passed. We are, accordingly, unpersuaded by this argument.

Hutchinson finally argues that the Pennsylvania Supreme Court's finding that the children's testimony was corroborated by other consistent testimony was incorrect, because the corroboration amounted to no more than hearsay versions of the children's testimony. Hutchinson, however, has cited to no authority for the proposition that evidence that the children made prior consistent statements has no value or that evidence of those prior consistent statements could not corroborate their in-court testimony. Hutchinson also ignores the testimony of Eugene Green regarding the black Lexus he observed leaving the scene immediately before he learned that Epps had just been shot. (See 12/3/99 N.T. at 47-51.)

As none of Hutchinson's arguments regarding this claim are supported by facts or law, we conclude that Hutchinson's trial and appellate counsel were not ineffective for failing to raise this claim at trial and on appeal, because counsel cannot be ineffective for failing to raise a meritless claim. Bui, 795 F.3d at 366-67 (citation omitted). We thus conclude that Hutchinson has failed to satisfy his burden of establishing that the decision of the Pennsylvania Supreme Court as to this

21

claim was contrary to and an unreasonable application of <u>Strickland</u>. Accordingly, we overrule Hutchinson's objection to the Magistrate Judge's recommendation that we deny this claim. (R&R at 87-88.)

### D. Improper Vouching

Hutchinson argues that his substantive due process rights were violated when the trial court allowed the prosecutor and a detective to improperly vouch for the veracity of the Epps children. Hutchinson claims that his trial and appellate counsel were ineffective for failing to object to this improper vouching at trial and raise this issue on direct appeal. Hutchinson's claim concerns one comment made by the prosecutor during his examination of Philip Epps and a small portion of the testimony of Detective James Dougherty regarding his interview of Desiree Epps following her mother's murder. Specifically, Hutchinson relies the prosecutor's statement that Philip Epps gave a "pretty good" answer to his question about the difference between the truth and a lie:

> A: Okay. The truth is like the right thing to do--Well, it is like the right thing to happen, and a lie is the opposite of the truth.
> Q: That is pretty good. That is stated pretty good. The truth is telling about the thing the way it happened and a lie is telling something else- -
> A: Yes.
> Q: That didn't happen, okay. Philip, do you recall the last day that you saw your mom?

(12/2/99 N.T. at 54.) Hutchinson also relies on Detective Doughtery's testimony at trial that he was comfortable that Desiree Epps knew the difference between the truth and a lie when he interviewed her at the police department after her mother was killed:

> Q: How did she [Desiree Epps] appear when you interviewed her? What did she look like? What was her demeanor like?
> A: It appeared to me that she had been crying just prior to me interviewing her inside homicide. She seemed somewhat stunned by what she had seen, but she could easily answer the questions that I asked her about telling the truth, not telling the truth and understanding what a lie was.
> Q: Were you comfortable at least with the fact that she understood what the truth was and what telling a lie was?

22

A: Yes, sir. I was very comfortable with her understanding of that.

(12/3/99 N.T. at 151.)

Hutchinson argued in state court that the examination and testimony reprinted above constituted improper vouching by the prosecutor and the detective. The Pennsylvania Supreme Court denied this claim on the ground that neither the prosecutor nor Detective Dougherty "vouched" for the testimony of the Epps children. The Pennsylvania Supreme Court explained that "[c]ontrary to [Hutchinson's] assertion, Detective Dougherty did not offer his opinion as to the credibility of Desiree's testimony, but rather opined as to her demeanor and her ability to distinguish truth from a lie during his interview with her on the night of her mother's murder." Hutchinson II, 25 A.3d at 299 n.11. The Pennsylvania Supreme Court also found that "[c]ontrary to [Hutchinson's] assertions, the prosecutor did not state his opinion that the children's testimony was truthful. Rather, the prosecutor merely stated that Philip's attempt to state the difference between the truth and a lie was 'pretty good.'" Id. (citing 12/2/99 N.T. at 48 -49, 55). The Pennsylvania Supreme Court further concluded that these comments were not prejudicial "such that the result of [Hutchinson's] trial would have been different had defense counsel objected. As we have explained in detail . . . despite lengthy and probing cross-examination, the children were unwavering in their testimony that [Hutchinson] shot their mother." Id.

Hutchinson argues that the Pennsylvania Supreme Court's decision as to this claim was based on an unreasonable determination of the facts. He relies on Justice Saylor, who dissented from the Pennsylvania Supreme Court's decision, stating that, "[w]hile I agree the detective could testify to his observations of the child's demeanor, I fail to see how a law enforcement officer's opinion as to her extrajudicial truth-telling ability would not bolster the Commonwealth's position concerning such capability in the courtroom." Id. at 322-23 (Saylor, J. dissenting). Justice Saylor

23

also believed that the prosecutor's comments to Philip "represented objectional bolstering." Id. at 323; see also id. (stating "it is difficult to envision a more straightforward example of bolstering than affirming a witness's response as 'pretty good'"). The Magistrate Judge recommended that we deny this claim, recommending, inter alia, that neither the comment made by the prosecutor nor the comment made by the detective constituted improper vouching. Hutchinson objects to this recommendation as erroneous and contends that the Magistrate Judge ignored his argument that the Pennsylvania Supreme Court's resolution of this claim was based on an unreasonable determination of the facts in light of the evidence.

"'Vouching constitutes an assurance by the prosecuting attorney of the credibility of a Government witness through personal knowledge or by other information outside of the testimony before the jury.'" United States v. Gonzalez, 905 F.3d 165, 203 (3d Cir. 2018) (quoting United States v. Walker, 155 F.3d 180, 184 (3d Cir. 1998)), cert. denied, 139 S. Ct. 2727 (2019). "To prevail on a vouching claim, a defendant must demonstrate that: '(1) the prosecutor [assured] the jury that the testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge, or other information not contained in the record.'" Id. (quoting Walker, 155 F.3d at 187). "Impermissible vouching can occur through the use of witness testimony" as well as through comments made by the prosecutor. Id. (citing United States v. Berrios, 676 F.3d 118, 134 (3d Cir. 2012)). However, as the Third Circuit explained in Walker, "it is not enough for a defendant on appeal to assert that the prosecutor assured the jury that a witness' testimony was credible." Walker, 155 F.3d at 187. Rather, "[t]he defendant must be able to identify as the basis for that comment an explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record." Id. (citing Lawn v. United States, 355 U.S. 339, 359 n.15 (1958)). Thus, "where a prosecutor argues that a

24

witness is being truthful based on the testimony given at trial, and does not assure the jury that the credibility of the witness [is] based on his own personal knowledge, the prosecutor is engaging in proper argument and is not vouching." Id. (citing United States v. Pungitore, 910 F.2d 1084, 1125 (3d Cir. 1990)).

Here, the prosecutor's comment regarding Philip Epps's description of the difference between the truth and a lie was not based on the prosecutor's personal knowledge or on information not contained in the record. See Gonzalez, 905 F.3d at 203. Consequently, that comment was not improper vouching. Moreover, the detective testified only that he believed that Desiree Epps understood the difference between the truth and a lie on the day of her mother's death two years prior to her trial testimony. He did not testify that he believed that Desiree Epps had told him the truth at that time, or that her trial testimony was truthful. Thus, his trial testimony did not constitute improper vouching. See id. Any objection to the prosecutor's statement or the detective's testimony on the ground that such was improper vouching would, therefore, have been meritless. We conclude, accordingly, that Hutchinson's trial and appellate counsel were not ineffective for failing to raise this issue at trial and on appeal because counsel cannot be ineffective for failing to raise a meritless claim. Bui, 795 F.3d at 366-67 (quotation omitted). We further conclude that Hutchinson has failed to satisfy his burden of establishing that the decision of the Pennsylvania Supreme Court as to this claim was based on an unreasonable determination of the facts. Accordingly, we overrule Hutchinson's objection to the Magistrate Judge's recommendation that we deny this claim. (R&R at 90-92.)

> E.     Failure to Investigate Alternative Defenses

Hutchinson argues that his trial counsel was ineffective for failing to investigate alternative defenses, specifically the defenses of diminished capacity, heat of passion, and voluntary

25

intoxication. Hutchinson asserts that, notwithstanding his professed desire to utilize an alibi defense, his trial counsel should have investigated alternative defenses that would have required Hutchinson to admit that he shot Epps, so that he could advise Hutchinson on the best defense to pursue. Hutchinson contends that "a reasonably competent attorney would have taken notice of the Commonwealth's evidence," investigated mental health defenses, and presented those defenses to him. (Pet. Reply at 21-22.)

Hutchinson argued in state court "that trial counsel was ineffective for failing to investigate or to present several alternative defenses, specifically the defense of diminished capacity, due to mental defect or voluntary intoxication, and the defense of heat of passion" and that his appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness on appeal. Hutchinson II, 25 A.3d at 311-12. Under Pennsylvania law, "[a] defense of diminished capacity, whether grounded in mental defect or voluntary intoxication, is an extremely limited defense available only to those defendants who admit criminal liability but contest the degree of culpability based upon an inability to formulate the specific intent to kill." Id. at 312 (citations omitted). "A diminished capacity defense 'does not exculpate the defendant from criminal liability entirely, but instead negates the element of specific intent.'" Id. (quoting Commonwealth v. Williams, 980 A.2d 510, 527 (Pa. 2009)). "For a defendant who proves a diminished capacity defense, first-degree murder is mitigated to third-degree murder." Id. (citing Commonwealth v. Saranchak, 866 A.2d 292, 299 (Pa. 2005)). The Pennsylvania Supreme Court has "consistently declined to hold that trial counsel was ineffective for failing to advance a [diminished capacity] defense that directly and irreconcilably conflicted with the accused's claims of innocence." Id. at 312-13 (citing Rainey, 928 A.2d at 237). Moreover, the Pennsylvania Supreme Court has "held that the authority to concede criminal liability and to authorize the presentation of a diminished capacity defense rests

26

**solely** with the accused." Id. at 313 (citing Commonwealth v. Weaver, 457 A.2d 505, 506-07 (Pa. 1983).

The Pennsylvania Supreme Court denied Hutchinson's ineffective assistance of counsel claim based on trial counsel's failure to pursue diminished capacity defenses because Hutchinson "did not concede any liability in the killing of the victim. Rather, [he] relied on an innocence defense, presenting an alibi witness, attempting to undermine the credibility of the child witnesses, and attempting to inculpate the victim's husband in her murder." Id. The Pennsylvania Supreme Court explained that "[u]nder these circumstances, where [Hutchinson] did not admit killing the victim, but rather maintained his innocence, a diminished capacity defense was not available to him, pursuant to this Court's decisional law discussed supra, and trial counsel will not be held ineffective for failing to present an unavailable defense." Id. The Pennsylvania Supreme Court further determined that, "[b]ecause trial counsel was not ineffective, [Hutchinson's] derivative claims of appellate counsel ineffectiveness must also fail." Id. at 314 (citing citation omitted).

Under Pennsylvania law, "[a] heat of passion defense, like the diminished capacity defense, is a partial defense, focused on the element of intent." Id. (citing Commonwealth v. Laich, 777 A.2d 1057, 1061 (Pa. 2001); Commonwealth v. Legg, 711 A.2d 430, 432 n.3 (Pa. 1998)). "A defendant accused of murder may establish that he or she is guilty, not of murder, but rather of voluntary manslaughter, by proving that, at the time of the killing, he or she was acting under a sudden and intense passion resulting from serious provocation by the victim." Id. (citations omitted). "Emotions encompassed by the term 'passion' include 'anger, rage, sudden resentment or terror which renders the mind incapable of reason.'" Id. (quoting Commonwealth v. Miller, 987 A.2d 638, 650 (Pa. 2009)). The Pennsylvania Supreme Court denied Hutchinson's ineffective assistance of counsel claim based on his trial counsel's failure to investigate a heat of passion

27

defense because Hutchinson pointed to "no evidence that, at the time of the murder, he had been so provoked by the victim as to be compelled by passion beyond the control of his reason." Id. at 315.

The Magistrate Judge recommends that we deny Hutchinson's claim that his trial and appellate counsel were ineffective with respect to the investigation of alternative defenses because the Pennsylvania Supreme Court's decision was not an unreasonable application of clearly established federal law. Hutchinson objects to this recommendation on the ground that the Magistrate Judge improperly focused his analysis on whether trial counsel was ineffective for failing to present diminished capacity defenses and failed to analyze his argument that trial counsel was ineffective for failing to investigate these defenses.

Hutchinson contends that the Pennsylvania Supreme Court's determination was an unreasonable application of clearly established "Supreme Court" law because it did not sufficiently analyze his argument that trial counsel was ineffective for failing to investigate these alternative defenses. (Obj. at 16.) He relies on Sears v. Upton, 561 U.S. 945 (2010), in which the Supreme Court stated that it had "rejected any suggestion that a decision to focus on one potentially reasonable trial strategy . . . was 'justified by a tactical decision' when 'counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background.'" Id. at 954 (quoting Williams v. Taylor, 529 U.S. at 396); see also Rompilla v. Beard, 545 U.S. 374, 387 (2005) ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." (quotation omitted)). Hutchinson maintains that, if his trial counsel had performed the requisite thorough investigation, he would have discovered evidence supporting mental health defenses, such as statements from lay witnesses provided by the prosecution that

28

Hutchinson had been fighting with the decedent for a week prior to the killing, statements from former girlfriends of Hutchinson that he had a bad temper and flew into rages, and a mental health evaluation of Hutchinson performed on June 1, 1999 in connection with Hutchinson's sentencing in another case.

However, even assuming arguendo that trial counsel's failure to investigate these alternative defenses was unreasonable under prevailing professional standards, Strickland, 466 U.S. at 687-88, Hutchinson cannot establish that he was prejudiced by this failure. See Travillion, 759 F.3d at 289 ("We may address the prejudice prong first '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice.'" (alteration in original) (quoting Strickland, 466 U.S. at 697)). As the Pennsylvania Supreme Court discussed, these alternative defenses that Hutchinson faults counsel for not investigating were not available to Hutchinson unless he admitted that he killed Stephanie Epps. See Hutchinson II, 25 A.3d at 312 (stating that, under Pennsylvania law, "[a] defense of diminished capacity, whether grounded in mental defect or voluntary intoxication, is an extremely limited defense available only to those defendants who admit criminal liability but contest the degree of culpability based upon an inability to formulate the specific intent to kill." (citations omitted); id. at 314 ("A defendant accused of murder may establish that he or she is guilty, not of murder, but rather of voluntary manslaughter, by proving that, at the time of the killing, he or she was acting under a sudden and intense passion resulting from serious provocation by the victim."). Even now, when he contends that he would have benefited from his counsel's investigation of these defenses, Hutchinson does not admit that he killed Epps. Hutchinson also does not assert that he would have been willing to make such an admission at trial. We conclude, accordingly, that Hutchinson has not established that his trial and appellate counsel were ineffective for failing to raise this issue at trial and on

appeal and we further conclude that Hutchinson has failed to satisfy his burden of establishing that the decision of the Pennsylvania Supreme Court as to this claim was contrary to and an unreasonable application of <u>Strickland</u>. Accordingly, we overrule Hutchinson's objection to the Magistrate Judge's recommendation that we deny this claim. (R&R at 105.)

## IV. CONCLUSION

For the foregoing reasons, we overrule each of Hutchinson's objections and adopt Magistrate Judge Lloret's Report and Recommendation in its entirety, as discussed herein. In addition, as Hutchinson has failed to make a substantial showing of the denial of a constitutional right or demonstrate that a reasonable jurist would debate the correctness of this ruling, we decline to issue a certificate of appealability under 28 U.S.C. § 2253(c)(2). An appropriate Order follows.

BY THE COURT:

John R. Padova, J.